Filed 5/12/26  P. v. Reed CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM J. REED.<br><br>        Defendant and Respondent. | A170827<br><br>(Contra Costa County<br>Super. Ct. No. 051819838) |

William J. Reed, an attorney, appeals from a judgment entered after a jury found him guilty of embezzling $400,000 in settlement funds from two sets of clients—John Stone and Kristine Turner (the "Stone-Turners") and Marlene and Herb Schuler (the "Schulers") (sometimes referred to collectively as "plaintiffs").  Reed contends that the trial court committed instructional and other errors during the trial and that insufficient evidence established plaintiffs' ownership of the settlement funds.

We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

In October 2023, the Contra Costa County District Attorney charged Reed with two counts of grand theft by embezzlement (Pen. Code, § 487,

---

[1]    We summarize only the facts and proceedings relevant to the issues raised on appeal.

1

subd. (a); all unlabeled statutory references are to this code). The first amended information also alleged the offenses constituted a white-collar crime scheme that resulted in a taking of over $100,000 in property (§ 186.11, subd. (a)).

At trial, there was no dispute that Reed represented plaintiffs in a lawsuit against PG&E and that he received a $200,000 settlement on behalf of the Stone-Turners and a $200,000 settlement on behalf of the Schulers. There is also no dispute Reed kept all of the funds for himself, claiming he believed in good faith that the entirety of the settlement proceeds was rightfully his.

## A. Prosecution Case

In 2006, a major wildfire (known to some as the Zamora wildfire) occurred in the Woodland area. One of the wildfire victims, David Hatanaka, consulted with Reed about suing PG&E for damages. During these discussions, Reed informed Hatanaka that Reed's attorney fees "wouldn't come out of [the] settlement but would be paid by PG&E."

Reed asked Hatanaka to help gather other wildfire victims for a lawsuit and provided Hatanaka with drafts of letters inviting victims to come together to seek recovery from PG&E. Though Hatanaka did not write the letters, he reviewed and sent them out on his own letterhead. One version of this letter (the "Hatanaka Letter") stated: " 'And on top of this, PG&E must pay all of our attorney's fees, expert fees, and court costs necessary to get this fair payment, not the usual attorney fee charge of a third or 40 percent taken out of the settlement amount.' " The Hatanaka Letter also informed community members of a town hall meeting that would take place on June 28, 2007.

2

On June 28, 2007, Reed attended the town hall meeting along with two local attorneys.  During the meeting, Reed represented that any settlement with PG&E would not be reduced by attorney fees, which would be paid separately by PG&E.

Around September 2008, Reed sent Hatanaka a representation agreement.  Section 4 of the agreement, titled "Legal Fees and Costs," stated: "You agree that the reasonable value of my services will [*sic*] at the hourly rate of $625.00."  Hatanaka did not sign this agreement.  Instead, Hatanaka and his wife signed another agreement that had no fees and costs section, but stated in a "Client's Duties" section that client duties "include expenses incurred in the ordinary course of [Reed's] business, such as photocopying and other reproduction costs (@.10 per page), parking and other travel expenses, charges for legal research computer time and other similar items."  Hatanaka and his wife added a handwritten note below this section which stated:  "Our financial responsibilities will be $0 for all costs and fees."  This note was initialed by both Hatanaka and his wife, and also by Reed.  Hatanaka testified he and his wife added this note because they found this section of the representation agreement to be " 'unclear.' "

In September 2008, Reed sent the Stone-Turners a representation agreement accompanied by a cover letter.  Section 4 of the representation agreement was titled "Legal Fees and Costs" and stated:  "You agree that the reasonable value of my services will [*sic*] at the hourly rate of $625.00."  This section also stated there would be certain costs the Stone-Turners would not have to pay, but Reed "d[id] charge for other costs, and [the Stone-Turners] agree[d] to pay for those costs and expenses in addition to [Reed's] hourly fees."  Notwithstanding this provision, Reed's accompanying cover letter stated the following:  "Section (4) deals with Attorney Fees and Costs.  It is

3

part of our agreement that all fees and costs incurred in this case will be paid by PG&E under the Inverse Condemnation claim as the law requires. [¶] Phrased another way – and different from the usual 33 1/3% to 40% of recovery fee arrangement – there will be no reduction from your recovery from PG&E for my services. To the extent we are successful, you will be paid for your damages without reduction for attorney fees and costs, and I will be paid separately for the fees and costs."

Stone understood the cover letter and representation agreement to mean that section 4 of the representation agreement, relating to "Legal Fees and Costs," was "irrelevant" because PG&E would be responsible for the attorney fees and costs and plaintiffs would receive "100 percent of whatever [PG&E] gave [them] because [Reed] was getting paid by PG&E." Stone testified he discussed all of this with Reed before signing the agreement, and Reed confirmed that PG&E would pay attorney fees to Reed directly and plaintiffs would be "paid whatever we got." Stone stated he would never have signed the agreement if he were required to pay Reed $625 an hour.

The Hatanakas, Stone-Turners, Schulers, Tom Diaz, and a few other individuals retained Reed to represent them in a lawsuit against PG&E ("*Schuler v. PG&E*"). These individuals decided to retain Reed based on their understanding that they would not have to pay Reed's attorney fees. Stone testified his main concern about suing PG&E was "[h]ow much [he] would have to pay the lawyer," while Turner indicated the language in the Hatanaka Letter stating that PG&E would have to pay all of the attorney fees was "very important" to her as she knew that litigation "could last a long time" and be "very costly."

Reed filed a lawsuit against PG&E on behalf of plaintiffs, the Hatanakas, and Diaz in September 2008. From 2008 to 2012, plaintiffs did

4

not receive invoices from Reed for his fees and costs. During this time period, Reed confirmed with them several times that they would not have to pay any fees or costs.

As time passed, Hatanaka found it harder to contact Reed about the case, so he and his wife eventually terminated Reed and retained a new attorney in the lawsuit. This new attorney settled their case and Diaz's case within a few months, but Reed asserted a lien against their settlements based on the work he did for them. When the parties were unable to resolve this dispute, PG&E, the Hatanakas, and Diaz filed a lawsuit against Reed (the "PG&E Fee Lawsuit") to have a court determine the amount of fees to which Reed was entitled.

The PG&E Fee Lawsuit settled in August 2013, with PG&E agreeing to pay Reed $255,000. $204,000 of the $255,000 amount was deemed to represent payment for Reed's work in representing all the plaintiffs in the *Schuler v. PG&E* action. In acquiescing to this settlement, Reed "agree[d] that PG&E shall be entitled to a credit of $204,000 against any award of attorney's fees or costs made in favor of any or all of the remaining plaintiffs [e.g., the Stone-Turners and the Schulers] in *Schuler v. PG&E.*" The agreement further stated that "Reed should not receive a double recovery of fees or costs in connection with his work in *Schuler v. PG&E.*"

In August 2013, Reed told plaintiffs that PG&E had made them each a settlement offer of $120,000. At Reed's urging, plaintiffs rejected the settlement offer and attended a judicial settlement conference with PG&E on August 30. At the August 30 settlement conference, PG&E offered $200,000 to the Stone-Turners, $200,000 to the Schulers, and $75,000 to Reed. The Schulers wanted to accept this offer but watched Reed refuse it; the Schulers did not say anything because Reed had told them not to speak during the

5

proceedings. As for the Stone-Turners, Reed informed them they could "do much better" as the Hatanakas received $700,000 and Diaz received $500,000. But in counseling the Stone-Turners to reject the settlement offer, Reed did not tell them they would have to pay his attorney fees and costs if they went to trial. As such, the Stone-Turners decided to reject the settlement offer.

A few days later, Reed met with plaintiffs and told them he would not go to trial, which was scheduled for the following month, unless they paid him $75,000 so he could retain an expert witness for the matter. Reed also began expressing doubts about whether PG&E actually started the fire. When plaintiffs indicated they were unwilling to pay this money and asked Reed to take the $200,000 PG&E had previously offered them, Reed "shoved a piece of paper" at them and indicated they owed him approximately $600,000.

In September 2013, PG&E sent offers under Code of Civil Procedure section 998 (the "998 offers") for both the Stone-Turners and the Schulers, offering them each $200,000 "in satisfaction of all of their claims for damages, costs and expenses, attorney's fees, and interest in th[e] action." Neither of the 998 offers included a separate offer to pay attorney fees to Reed, but PG&E had previously paid Reed $204,000 for his work on behalf of all of the original plaintiffs in the *Schuler v. PG&E* lawsuit, including the Stone-Turners and the Schulers.

After receiving the 998 offers, Reed met with plaintiffs again and demanded they either provide him with $30,000 to take the case to trial or give him half of each of their $200,000 settlements. Reed then pushed a stack of billings towards plaintiffs and claimed he had done $900,000 worth of work on the case which someone had to pay. When Reed said this,

6

plaintiffs were "flabbergasted," "speechless," and "just sat there," while Stone responded "[t]hat's not what we agreed to." Turner said she could not really remember if she informed Reed they would accept the 998 offer at this time because they were all "in shock," but she stated it was possible they may have signaled acceptance of the offer because they did not know what other choice they had. Reed then abruptly left and said he would speak to PG&E.

Reed proceeded to accept the 998 offers on behalf of plaintiffs and, at Reed's suggestion, PG&E's attorney Mark Hancock delivered the settlement checks, which were made out to plaintiffs and Reed, to Reed's house on October 17, 2013. Plaintiffs, however, were unaware they had received settlement funds from PG&E until Hancock mentioned the checks had been delivered during a November 2013 hearing related to Reed's failure to properly dismiss the lawsuit.

After learning of the settlement checks, plaintiffs immediately attempted to contact Reed but did not hear from him until he showed up at the Stone-Turners' house in December 2013 to have them "sign off on the lawsuit" and "sign over the checks" so he could cash or put them in an account. Reed brought copies of the settlement checks but not the checks themselves. He also presented a "Final Accounting & Dispersal Agreement" which indicated the families would each only receive $97,948.83 after Reed deducted $100,000 in attorney fees and $2051.17 in costs. When Stone saw this, he brought out the cover letter and representation agreement and told Reed those documents indicated that PG&E would directly pay Reed for his fees and costs and plaintiffs for the settlement. Turner stated Reed was "not happy" with this and quickly left.

This series of events led to civil lawsuits between plaintiffs and Reed, at least one of which was pending when the criminal trial occurred. On

7

January 20, 2016, plaintiffs and Reed also participated in a California State Bar fee arbitration proceeding.

Plaintiffs never received "one penny" of the PG&E settlement funds, nor did they ever authorize Reed to move these settlement funds to any particular bank account or to use the funds for his own personal expenses.

At trial, Kenneth Tam—an expert in forensic accounting and taxes—testified he determined that both families' $200,000 checks were deposited in Reed's Interest on Lawyer's Trust Account ("IOLTA trust account") in November 2013. In April 2014, however, Reed transferred $200,000 of that amount to one of his personal accounts, $100,000 to another personal account, and $100,000 to a third personal account. At various points, Reed renamed some of the accounts to state the funds were being held in trust for himself and the Stone-Turners or the Schulers but, eventually, Reed transferred all of the money to his own personal accounts and spent it all on his personal expenses.

State Bar Supervising Attorney Manuel Jiménez testified as an expert on the Rules of Professional Conduct as they pertain to attorney handling of funds and client trust accounts. Jiménez testified that attorneys have a fiduciary duty to put their clients' interests above their own and are ethically obligated to place funds received on behalf of a client into a client trust account. Jiménez also testified that an attorney may not withdraw any funds from the client trust account so long as there is a dispute over the division of funds that has not been resolved by the parties' agreement or a final judicial adjudication. Jiménez explained, however, that funds consisting solely of attorney funds cannot be placed in a client trust account. During Jiménez's testimony, the trial court repeatedly clarified to the jury that violating State Bar rules is not itself a crime.

8

## B.    Defense Case

The first defense witness was attorney Michael Meadows, who indicated he had previously testified as an expert in billing dispute cases. Meadows testified that Reed's $625 hourly rate was reasonable.  He also stated it would be a common practice for a settling defendant in an inverse condemnation case to ask to see a representation agreement to determine an attorney's billing rate.  Based on his review of Reed's billing records in the matter, Meadows believed the amount of time Reed put into the case was reasonable.

Reed then took the stand.  On direct examination, Reed testified that at the June 2007 town hall meeting, he told the wildfire victims that they could "never afford" the attorney fees needed to bring a case against PG&E but indicated that by statute PG&E "would pay [the attorneys] at the other end." Reed also testified that when he met with the Schulers, he told them that "PG&E would pay all of the attorney's fees," that they would only have to pay "minimal" costs of between $500 and $1,000, and that PG&E would repay these costs at the conclusion of the case.  Reed also acknowledged he had written the cover letter accompanying the representation agreements which stated that " 'all the fees and costs incurred in th[e] case w[ould] be paid by PG&E.' "  Reed, however, testified he made a drafting error in this letter and had intended to instead say all fees and costs would be " '*repaid*' "—not " 'paid' "—by PG&E under the inverse condemnation claim.  (Italics added.)

As for the $255,000 Reed received through the settlement of the PG&E Fee Lawsuit, Reed contended that sum covered only his fees for services rendered to the Hatanakas and Diaz and not fees for work done for the other plaintiffs.  When the trial court inquired about the language in the settlement agreement which stated that $204,000 of the $255,000 amount

9

would be " 'deemed to represent payment to Reed for fees for legal services in *Schuler vs. PG&E* up to December 2012,' " Reed responded the designated amount merely "reduce[d]" the approximately $900,000 he believed he was owed for the work he had done on plaintiffs' case.

With regard to the 998 offers of $200,000 for the Stone-Turners and $200,000 for the Schulers, Reed testified he told them he owned and was entitled to fees and costs under Civil Code section 1021.9 ("Section 1021.9"). Reed therefore urged them to go to trial and at one point offered to loan them $30,000 to do so. Plaintiffs, however, disagreed, pointing to Reed's cover letter and maintaining that Reed had "already been paid." Reed told plaintiffs to consult with another attorney while insisting the attorney would confirm that Section 1021.9 granted Reed priority of interest in their settlement funds. In the alternative, Reed said plaintiffs could split the settlements such that each family would receive $100,000, and Reed would "reduce [his] claim" for attorney fees to $100,000 and be paid from the settlement funds.

Reed stated plaintiffs agreed to "take the split" the following week, and Reed communicated this acceptance to PG&E. Reed confirmed he received PG&E's settlement checks for plaintiffs and stated he transferred the $400,000 into an IOLTA trust account. He also claimed that the day after he received the checks, he faxed copies of them to the Stone-Turners' new attorney, Wareham Seaman, who indicated he would transmit copies to the Stone-Turners and to Marlene Schuler.

Reed testified that at some point, plaintiffs complained to the State Bar that they did not have a retainer agreement with Reed, that Reed settled the matter without their authorization, and that Reed had forged their names on the settlement checks ("Settlement Authorization Dispute"). In 2015,

10

however, Reed claimed plaintiffs conceded or were no longer contesting their authorization of the settlement. Reed then believed the "confusion about the ownership [of the settlement funds] had been resolved." Reed also stated the issue of ownership over the funds was "resolved both by the State Bar and by the statements of Mr. Seaman and his clients on January the 26th of 2016," and there was a "consensus" among "six different entities" that the dispute had been resolved. Reed did not specify which entities these were but claimed he believed at that point that "all of the impediments to moving the money were gone" and "[they had] answered the question of entitlement." As such, Reed transferred the money into his personal account, declared $200,000 of this money as profits on his 2015 incomes taxes, and declared the other $200,000 as profits on his 2016 income taxes.

Defense counsel asked Reed to explain the reasons Reed believed in good faith that he owned the entirety of the $400,000 in settlement funds. In response, Reed asserted that Section 1021.9 and an unidentified California Supreme Court decision interpreting this statute purportedly granted him "first priority" to plaintiffs' settlement funds. At some point in the questioning, the trial court interjected and pointed out that based on its reading of the statute, Section 1021.9 did not give an attorney first priority over client settlement funds. Instead, the court noted, Section 1021.9 merely authorized a prevailing party in a nuisance action to collect attorney fees. The court then remarked that Reed was trying to "wrap" himself in a statute that did not say what he was claiming it said. Reed, however, continued to insist that Section 1021.9 established his entitlement to the entirety of plaintiffs' settlement funds.

Following this line of questioning, the trial court made the following announcement to the jury: "I want to clear up something that we got into a

11

little earlier. [¶] We are not here to decide whether Mr. Reed is right or wrong about his being entitled to the money. We are here to decide whether he has a good faith belief that he was entitled to the money. [¶] We will be instructing you on that. [¶] He had been referring in what I now take to have been shorthand to the statute number that I said doesn't say what he said it said. However, he says there is case law interpreting it that does say what he is saying. [¶] If he believes that, it doesn't matter whether he is right or wrong, and, frankly, I haven't read this case law so I don't know if he is right or wrong. It is his state of mind and not the underlying law that matters. [¶] The reason I bring that up is because I realized it might have given you the impression that I was somehow lecturing Mr. Reed on how he was wrong on the law. That wasn't my intention at all. I don't know what this case law he is talking about says. He had referred to a statute. I looked up the statute. Doesn't look to me like the statute says what he said it is going to say. [¶] But if other law says that or if he reasonably believed that other law says that, then he does, okay."

On cross-examination, Reed conceded his cover letter to plaintiffs was part of his representation agreement with them, and he further acknowledged this agreement would dictate how much money he would receive from their acceptance of a 998 offer. However, Reed resisted the prosecutor's suggestion that the cover letter and representation agreement should be read together, noting the trial court had "to make that decision." In response, the court interjected that the criminal trial was not the forum for that issue and that the court had been "telling the jury for the last week that [they] [we]re not dealing with the merits of any civil dispute." The court indicated the dispositive issue was Reed's "state of mind," "what actually was understood and discussed among the parties at the time," and Reed's "belief

12

about what his obligations were."  The court concluded:  "If it turns out he's wrong about what the contract was, you don't care and I don't care."

Later on in the cross-examination, Reed reversed himself on the issue of whether plaintiffs had agreed to split the settlement money with him. Instead, he testified plaintiffs "turned down the offer of the split, and as a consequence . . . got none [of the money]."  Reed asserted plaintiffs never claimed the settlement money was theirs or provided any basis for their belief they owned these funds.

At several points, Reed claimed he believed the settlement funds were entirely his "after the State Bar made that decision."  Reed did not specify which State Bar decision he was referring to, but this statement prompted the prosecutor to move to admit the award from the January 2016 State Bar fee arbitration.[2]  This nonbinding arbitration proceeding had taken place before a three-arbitrator panel that considered evidence and testimony regarding the fee dispute.  The award reflected the panel's determination that Reed owed plaintiffs $400,000.

On this score, the trial court had initially stated during pretrial proceedings that the parties were not allowed to discuss the State Bar fee arbitration apart from noting it had occurred.  The court also informed the jury earlier in the trial it would not be told the results of that proceeding because it was the jury's factual determinations and not those of the arbitration panel that would govern this case.

After Reed gave testimony implying the State Bar had determined he was entitled to plaintiffs' settlement funds, the trial court granted the prosecution's request, over the defense's objection, to admit the fee award for

_____

[2]     Reed was required to attend the arbitration proceeding after plaintiffs complained to the State Bar about his conduct.

impeachment purposes. While discussing this issue outside the presence of the jury, the court noted that Reed had "done his best to give the impression that he won the arbitration," and further stated that if Reed was "going to tell the jury" that the State Bar said he was entitled to the settlement funds, then the prosecutor would be "100 percent entitled to bring out the fact that it was a lie." When the award was admitted into evidence, however, the court cautioned the jury that the award was not evidence of the truth of its contents but was admissible because it could bear on whether Reed had a good faith belief he was entitled to the money or knew there was a dispute with plaintiffs over ownership of the funds.

Upon further cross-examination on this issue, which included a review of the findings in the State Bar fee arbitration award, Reed acknowledged the State Bar did not actually tell him he was entitled to the settlement funds. Instead, Reed admitted the State Bar had merely indicated it would not file charges against him in the *separate* complaint filed by plaintiffs relative to the Settlement Authorization Dispute where plaintiffs claimed they had no retainer agreement with Reed, did not authorize him to settle their matter, and forged their signatures on the settlement checks. Upon additional questioning, Reed also admitted that after the State Bar fee arbitration was initiated but before the panel issued a decision, he moved the settlement funds into his own personal account despite knowing plaintiffs were claiming ownership of those funds.

During this portion of the questioning, the trial court reiterated to the jury that "[a]n arbitration award does not determine, for your purposes, whether or not the clients or Mr. Reed was entitled to that money." It also reminded the jury the award was non-binding and relevant only insofar as it related to the prosecution's assertion that the award cast doubt on Reed's

14

good faith belief in his ownership of the money and put him on notice of the fact there was a dispute over the funds.

On redirect examination, Reed outlined five bases for his purported good faith belief he owned the entirety of the settlement funds: (1) Reed believed that inverse condemnation cases statutorily allow for the recovery of attorney fees; (2) Section 1021.9 and a California Supreme Court decision interpreting that statute provided that any fees incurred belonged directly to the attorney; (3) the Commercial Code granted Reed a security interest in any settlement and provided that plaintiffs consented to having their award reduced by attorney fees and costs when they signed the retainer agreement; (4) Reed had a possessory lien over any recovery by plaintiffs that entitled him to take first from the recovery before passing the rest onto plaintiffs; and (5) Reed had an implied contractual lien that granted him a "greater" interest in the settlement funds and gave him a "right to possess[] and dispos[e] [of the funds] until there [w]as a determination made by the court."

C.     **Jury Instruction Discussions and Reopened Redirect Examination of Reed**

Outside the presence of the jury, the trial court and the parties discussed whether jury instructions should be given regarding Reed's legal theories of ownership of settlement funds. During these discussions, the court indicated it believed Reed's theories were "baloney," as they addressed only the issue of an attorney's entitlement to attorney fees from either a defendant or a client, and not the issue of how to divide settlement funds between a client and attorney. Nor, in the court's view, did these theories entitle an attorney to "take his last dollar out before the client sees a penny." The court stated it would be willing to instruct on these theories if requested to do so by Reed but also warned that if the court did not agree with the

15

theories, it would also "give the opposite instruction." In response, defense counsel declined jury instructions regarding Reed's theories of ownership.

When these discussions resumed outside the presence of the jury the following day, the court highlighted it had been "making a point in front of the jury of talking about how the only thing that really counts is not the truth of the law, but whether Mr. Reed had a good faith understanding of the law." The court then expressed concerns about how the jury was to determine if Reed believed in good faith that he owned the settlement funds if the jury did not understand anything about the law in this area. The court reiterated its willingness to instruct on Reed's theories of ownership with the caveat that if it disagreed with Reed's theories, it would "shoot them down." The defense again declined such instructions.

In response, the trial court continued to express concern about how the jury was going to understand the legal issues involved in Reed's good faith defense. The court then invited the parties to consider whether they wanted to have a legal expert testify as to whether or not Reed's contentions were in good faith because the court was concerned that, apart from Reed's testimony, no one was "attempting to tell [the jury] whether [Reed] [w]as right or wrong." However, the court stated that "[i]f neither side wants me to instruct and neither side wants to put on any more witnesses, that's okay with me; I will leave it to you to argue to the jury about what they should or should not think about whether Mr. Reed's articulated theories are in good faith or not."

Defense counsel then stated his position was to "leave it be" with no further instructions and the jury could decide whether Reed acted in good faith belief. Nonetheless, the trial court invited both sides to consider over

16

the upcoming weekend whether they wanted to present further evidence or have the court provide jury instructions on this issue.

The following Monday, Reed asked if he could retake the stand, and the trial court permitted him to do so subject to cross-examination. Before Reed took the stand, the court informed the jury it had extensive discussions with the parties around the issue of Reed's testimony that he had a good faith belief he was entitled to keep the entire $400,000. The court then reminded the jury of what the court had been saying all along: "We are not here to try whether Mr. Reed's opinion was right or wrong, we are here to try, among other things, whether Mr. Reed, in good faith, held such an opinion, and if so, whether holding such an opinion was reasonable."

On the reopened redirect examination, Reed touted his experience as a lawyer and his familiarity with statutes that establish whether a lawyer or client gets paid first from settlements such as the one obtained in plaintiffs' matter. Reed also claimed to have done legal research around this issue, stating he relied on *Flannery v. Prentice* (2001) 26 Cal.4th 572, along with the other theories of ownership he previously testified about, in concluding an attorney had the right to be paid first in trespass cases such as these.

## D.    Jury Instructions and Closing Arguments

As relevant here, the trial court's jury instructions included the following instructions regarding the crime of grand theft by embezzlement: "Count 1 relates to the Schulers; Count 2 relates to the Stones and Turners. To prove that the defendant is guilty of this crime, the People must prove that, one, an owner entrusted his or her property to the defendant; two, the owner did so because he or she trusted the defendant; three, the defendant fraudulently took or used that property for his own benefit; and, four, when the defendant took or used the property, he intended to deprive the owner of

17

it." "It is not necessary that the defendant received the property directly from the owner. If the property was received from a third party under circumstances whereby it was received by the defendant on behalf of or in trust for the owner, and the defendant took the property for his own use without authorization, that may be grand theft by embezzlement. [¶] It is sufficient that the defendant and the owners were in a relationship of trust and that the relationship is the reason why the third party transferred the property to the defendant. [¶] It is not necessary that the owners continued to trust the defendant by the time the property was taken. [¶] A person acts fraudulently when he or she takes undue advantage of another person or causes a loss to that person by breaching a duty, trust, or confidence."

The trial court also gave the following jury instruction regarding Reed's good faith defense: "A good faith belief in acting with authorization to use the property is a defense. In deciding whether the defendant believed that he had a right to the property and whether he held that belief in good faith, consider all the facts known to him at the time he obtained the property, along with all the other evidence in the case. [¶] The defendant may hold the belief in good faith, even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith."

In its closing argument, the prosecution argued the entirety of the $400,000 in settlement proceeds belonged to plaintiffs. The prosecutor began by highlighting Reed's repeated representations to the wildfire victims that they would not have to pay his attorney fees and costs because PG&E would pay them, and that their recovery would not be reduced by the costs of his services. The prosecutor then noted that Reed entered into a representation agreement with plaintiffs that incorporated a cover letter with the same

18

term—namely, that any recovery obtained from PG&E would not be reduced by Reed's attorney fees and costs because he would be paid separately. The prosecution argued Reed's statements and the representation agreement were "incredibly clear" that any recovery from PG&E, which would include the 998 offers of $200,000 for each of the families, would not be reduced by Reed's attorney fees and costs. Reed, however, acted to appropriate all of these funds. Additionally, Reed had earlier obtained payment for his work on plaintiffs' case through the settlement of the PG&E Fee Lawsuit.

Relative to Reed's good faith defense, the prosecutor argued the February 2016 State Bar fee arbitration award demonstrated a lack of good faith on Reed's part because he moved the settlement funds into and out of his personal accounts and ultimately spent them even though the arbitrators determined plaintiffs were owed the entire $400,000.

The defense argued in closing: "At that time when PG&E wrote a check [for the 998 offers], whose money was that? Part of it was Turner, Schuler, Stone's. Part of it, if they had read what was sent to them, was Reed's, which would have been divided up. They were at odds with that about how to divide that money up." Without further explanation or reference to the representation agreements or Reed's theories of ownership, the defense also asserted the settlement funds received from PG&E "included Reed's attorney's fees."

Defense counsel then pointedly argued that "what's at issue here is the intent," and whether Reed believed in good faith that he had a right to the property he took. Counsel contended that Reed could hold a belief in good faith even if that belief was mistaken or unreasonable. He also asserted that Reed researched the issue and consulted with attorneys when forming his opinions on the issue of ownership. Counsel then stated that even if the jury

19

did not convict him, Reed would still be held accountable for his actions because the matter would return to civil court, which is "where it should be decided." At the end, counsel reiterated that the matter should be sent back to civil court because lawyers there "can look at the law and interpret it differently."

The jury ultimately convicted Reed of both counts of grand theft by embezzlement and found true the special allegation that the offenses constituted an aggravated white-collar crime involving the taking of over $100,000 in property.

DISCUSSION

Reed challenges his convictions on the bases of: jury instructional error; insufficiency of evidence to demonstrate plaintiffs owned the settlement proceeds; improper admission of the State Bar fee arbitration award; improper comments by the trial court during the trial; and cumulative error that prejudiced Reed. We address these contentions in turn.

## A. Purported Instructional Error

Reed contends the trial court removed the ownership element of the embezzlement charges from the jury's consideration and neglected its sua sponte duty to instruct the jury on the contract interpretation principles needed to determine the issue of ownership over the settlement funds.

### 1. Embezzlement Instructions

Reed acknowledges on appeal that the trial court correctly instructed the jury on the elements of embezzlement, which include an owner's entrustment of his or her property to the defendant (§ 503; *People v. Selivanov* (2016) 5 Cal.App.5th 726, 764).[3] However, Reed also points out the court repeatedly stated during trial that the jury was " 'not [t]here to decide

---

[3]     See pages 17–18, *ante,* for the court's embezzlement instructions.

20

whether [Reed] [wa]s right or wrong about his being entitled to the [settlement funds]' " but to determine if Reed held a good faith belief that he owned such funds.[4]  (Italics omitted.)  In Reed's view, such midtrial comments conflicted with the court's embezzlement instructions and essentially removed the element of ownership from the jury's consideration.

"When instructions are claimed to be conflicting or ambiguous, 'we inquire whether the jury was "reasonably likely" to have construed them in a manner that violates the defendant's rights.' [Citation.]  We look to the instructions as a whole and the entire record of trial, including the arguments of counsel." (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.)  If we determine there was a failure of instruction, such as the effective removal of an element of a crime from the jury's consideration, we must conduct a "thorough examination of the record" to determine if we can "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." (*Neder v. United States* (1999) 527 U.S. 1, 19 (*Neder*); see also *People v. Mil* (2012) 53 Cal.4th 400, 417 (*Mil*).)  For example, if a defendant contested the omitted element and raised evidence sufficient to support a contrary finding, the error is not harmless.  (*Neder*, at p. 19.)  Conversely, an instructional error is harmless where the reviewing court "concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence." (*Id.* at p. 17.)  "Our task, then, is to determine

---

[4]     Additionally, when Reed stated on cross-examination that a judge had to decide whether the cover letters and representation agreements with plaintiffs should be construed together, the court interjected that the criminal trial was not the forum for this issue and reminded the jurors they were not dealing with the merits of a civil dispute.  The court then refocused the jurors' attention on Reed's state of mind and his belief about what his obligations were, concluding with the statement that "[i]f it turns out [Reed's] wrong about what the contract was, you don't care and I don't care."

21

'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.' " (*Mil*, at p. 417)

As indicated, the trial court repeatedly commented during trial that the jury need not consider whether Reed was right or wrong in believing he owned or was entitled to the settlement funds. We will assume, for purposes of argument, that such comments amounted to a failure of instruction to the extent they could be understood as removing the ownership element of embezzlement from the jury's consideration, i.e., that "an owner entrusted his or her property to the defendant." But the question then arises whether such error was prejudicial. We conclude it was not because there was no evidence in the record that could rationally lead to a finding that Reed—as opposed to plaintiffs—owned the settlement funds. (See *Mil*, *supra*, 53 Cal.4th at p. 417.)

As a preliminary matter, we note Reed's closing argument never contended there was insufficient evidence of the ownership element of embezzlement; instead, he argued strenuously that he lacked the intent to commit the crime because he had a claim of right to the settlement funds and a good faith belief in his ownership thereof.

More importantly, the record contained no evidence rationally supporting a conclusion that the ownership element was not established. Indeed, it was undisputed at trial that Reed was plaintiffs' lawyer (and thus a fiduciary) in the lawsuit against PG&E; that PG&E's 998 offers provided for $200,000 to settle the Stone-Turners' claims and $200,000 to settle the Schulers' claims; that Reed accepted the 998 offers as plaintiffs' lawyer; and that Reed accepted both $200,000 settlement checks on plaintiffs' behalf in October 2013. It was also undisputed that Reed deposited the settlement checks into an IOLTA trust account before eventually transferring the funds

22

to his own personal accounts without plaintiffs' consent and spending them entirely.

Likewise, the evidence was uncontroverted that PG&E had already paid Reed $204,000 for his work on plaintiffs' behalf. And notwithstanding Reed's trial testimony that he believed he was entitled to 100 percent of the settlement funds (which supported his defense of good faith), his counsel acknowledged during closing argument that at least some "[p]art of [the 998 settlement funds] w[ere] Turner, Schuler, Stone's."

In sum, there was undisputed and overwhelming evidence that settlement funds belonged to plaintiffs and that, despite his fiduciary responsibilities and initial deposit of the funds into an IOLTA trust account, Reed transferred the money—unilaterally and without the benefit of an adjudicated judgment—to his personal accounts and spent it all.

At the same time, there was no record evidence upon which a rational jury could conclude that plaintiffs did not own the settlement funds paid by PG&E. To the extent Reed may have claimed a contractual right to his attorney fees as part of the settlement, the undisputed evidence made it unmistakably clear that Reed had no such right. Specifically, the evidence showed that before commencing the PG&E litigation, Reed solicited wildfire victims, including plaintiffs, with the representation that any settlement with PG&E would not be reduced by attorney fees, which would be paid separately by PG&E. Thereafter, Reed provided plaintiffs with a representation agreement containing a clause stating that plaintiffs "agree that the reasonable value of [Reed's] services" was $625 per hour and that plaintiffs "agree to pay for [certain] costs and expenses in addition to [Reed's] hourly fees." But that document was accompanied by a cover letter expressly stating it was "part of [the parties'] agreement" that "all fees and costs

23

incurred in th[e] case w[ould] be paid by PG&E under the Inverse Condemnation claim as the law requires." Consistent with Reed's oral representations to all the wildfire victims, the letter emphasized: "Phrased another way … there will be *no reduction from your recovery* from PG&E for my services. *To the extent we are successful, you will be paid for your damages without reduction for attorney fees and costs*, and *I will be paid separately* for the fees and costs."[5] (Italics added.)

Because there was no extrinsic conflict in the evidence, the question of whether the cover letter and representation agreement contractually obligated plaintiffs' payment of Reed's attorney fees is a question of contract interpretation that is subject to our de novo review. (See *Gilkyson v. Disney Enters., Inc.* (2021) 66 Cal.App.5th 900, 915 (*Gilkyson*).) Thus, we construe the terms of the parties' fee agreement under traditional principles of contract interpretation, mindful that any ambiguities must be resolved " 'in favor of a fair and reasonable interpretation' " in favor of the clients and against the attorney. (*M'Guinness v. Johnson* (2016) 243 Cal.App.4th 602, 617–618 (*M'Guinness*).)

Here, the plain language of the cover letter, which stated it was part of the parties' agreement, twice highlighted Reed's contractual representation that plaintiffs' recovery from PG&E would *not* be reduced by his attorney fees and costs and, instead, to the extent plaintiffs were successful in the lawsuit, Reed would be "paid by PG&E" or "paid separately." Reed did not advocate for a contrary interpretation of the cover letter at trial, apart from asserting

---

[5] On appeal, Reed argues the cover letter was not a part of the Schulers' agreement as Marlene did not recall signing the fee agreement (though she actually did) and denied receiving the cover letter. But Reed acknowledged on cross-examination that the cover letter received by the Stone-Turners was also likely provided to the Schulers, as Reed had a computer program that auto-generated the same letter to all of the prospective clients.

24

he had made a drafting error in the cover letter and intended to state that all fees and costs would be " 'repaid' " and not " 'paid' " by PG&E under an inverse condemnation claim.

On appeal, Reed suggests his fee agreement with plaintiffs was ambiguous as it did not address how settlement funds would be divided if PG&E decided not to pay "under the Inverse Condemnation claim as the law require[d]," or what to do in the "unanticipated" event of receiving a lump sum settlement offer as occurred here. In the face of this perceived ambiguity, Reed contends the representation agreement's provision for his $625 hourly fee controls, and the cover letter's provision of no reduction from recovery applies only "where the law required PG&E to separately pay Reed's fees." Reed's argument lacks merit.

As stated earlier, any ambiguities in a client fee agreement must be resolved in favor of a " 'fair and reasonable' " interpretation and in favor of the client. (See *M'Guinness*, *supra*, 243 Cal.App.4th at p. 617.) Here, the nebulous inverse condemnation language Reed cites was followed by two plainly-worded assurances that plaintiffs' damages and recovery would not be reduced by the costs for Reed's services. Contrary to Reed's suggestion, interpreting the agreement as requiring plaintiffs to pay, as a default, his fees of $625 per hour *except* where PG&E is legally obligated to pay attorney fees would be unfair and wholly unreasonable. Similarly, an interpretation requiring plaintiffs' payment of Reed's hourly rate—even when PG&E separately and actually pays his attorney fees—conflicts with the express terms of the cover letter and is equally unfair and unreasonable. Additionally, we note the cover letter emphasized the proposed fee arrangement was, for plaintiffs, superior to "the usual 33 1/3% to 40% recovery fee arrangement," precisely because "there will be no reduction from

25

[plaintiffs'] recovery." On this last point, it is inconceivable that a reasonable person would understand the agreement as entitling Reed to any percentage, let alone 100 percent, of any settlement achieved.

At bottom, the record demonstrates that plaintiffs were successful in obtaining settlements from PG&E and that Reed did in fact receive $204,000 from PG&E for his work on plaintiffs' case. Therefore, per the terms of the representation agreement and cover letter, the $400,000 in settlement funds belonged to plaintiffs and was not subject to reduction for Reed's attorney fees and costs.

Finally, we note Reed advanced several extra-contractual legal theories at trial that purportedly supported his defense of a good faith belief in his ownership of the settlement funds. But Reed points to no record evidence and offers no explanation in this court as to how those legal theories might defeat a contractual agreement between a lawyer and his clients in a situation such as this. Nor did he attempt to make such a showing below. Thus, even accepting that Reed believed such extra-contractual theories supported a good faith defense to the embezzlement charges (which the jury evidently rejected), he falls short of establishing that those theories legally undermined plaintiffs' contractual right to the settlement funds or otherwise rationally supported a contrary finding on the ownership element of the charges. (See *Neder*, *supra*, 527 U.S. at p. 19.)

In sum, there is no record evidence upon which a rational jury could conclude that plaintiffs did not own the settlement funds that were entrusted to Reed. As such, we conclude beyond a reasonable doubt that the jury verdict would have been the same even if the trial court had refrained from

making the midtrial comments challenged on appeal. (See *Neder*, *supra*, 527 U.S. at p. 19; *Mil*, *supra*, 53 Cal.4th at p. 417.)[6]

### 2. *Sua Sponte Duty to Instruct*

Reed argues the trial court failed to fulfill its sua sponte duty to instruct the jury on the relevant contract interpretation principles needed to evaluate the terms of the cover letter and representation agreement. In this regard, Reed points out the court was clearly conflicted about how the jury would adjudicate the issue of who was entitled to the settlement funds in the absence of instructions regarding either contract law or Reed's ownership theories. Yet, Reed states, the court left the question of which jury instructions to provide entirely up to the parties' counsel who ultimately declined any additional instructions. We conclude no error has been demonstrated.

"Trial courts only have a sua sponte duty to instruct on 'the general principles of law relevant to and governing the case.' " (*People v. Rubalcava* (2000) 23 Cal.4th 322, 333–334.) " 'That obligation includes instructions on all of the elements of a charged offense' [citation], and on recognized 'defenses . . . and on the relationship of these defenses to the elements of the charged offense.' " (*Id.* at p. 334.) Here, general principles of contract interpretation are not elements of either the offense of embezzlement or a defense thereto, and interpretation of a contract is a legal matter that falls within the province of the court (*Gilkyson*, *supra*, 66 Cal.App.5th at p. 915). In any event, even assuming the trial court was somehow subject to a sua sponte

---

[6]     For all the reasons stated, we likewise reject Reed's other contention that substantial evidence did not support the jury's finding that plaintiffs owned the settlement funds and that the evidence was insufficient to establish the special allegation that Reed took property worth more than $100,000 (§ 186.11, subd. (a)).

duty to instruct the jury on principles of contract interpretation, instructional errors are reviewed under the harmless error standard. (See *Neder, supra,* 527 U.S at p. 19.) Having concluded in part A.1, *ante,* that plaintiffs were not contractually obligated to pay Reed's attorney fees out of the settlement funds, we similarly conclude that any failure to instruct the jury on the relevant principles of contract law was also harmless.

## B.     Admission of State Bar Fee Arbitration Award

Reed challenges the trial court's admission of the State Bar fee arbitration award on various bases. We review this ruling for abuse of discretion. (*People v. Kerley* (2018) 23 Cal.App.5th 513, 553 (*Kerley*).)

Reed first points to Business and Professions Code section 6204, subdivision (e), which provides the award and determinations of State Bar fee arbitrators "shall not be admissible nor operate as collateral estoppel or res judicata in any action or proceeding." Reed also refers to Business and Professions Code section 6200, subdivision (h), which states that all discussions and offers of settlement made in a fee arbitration proceeding are confidential and may not be disclosed in subsequent proceedings.

In response, the People contend the evidence of the fee arbitration award was properly admitted for impeachment purposes under the doctrine of "opening the door." More particularly, the People point out the trial court had refused to allow any mention of the arbitral result until Reed implied in his testimony that the State Bar had actually *approved* his position that he owned the settlement funds. The People's argument is well taken.

"Under the doctrine of 'opening the door,' one party may render otherwise inadmissible evidence admissible by introducing the topic selectively such as to leave a misleading impression." (*Kerley, supra,* 23 Cal.App.5th at p. 553.) Thus, "[w]here part of an act, declaration,

28

conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party." (Evid. Code, § 356.)

*People v. Ramirez* (2022) 13 Cal.5th 997 (*Ramirez*) is instructive. There, defense counsel elicited testimony from a witness suggesting that police officers used "[t]rick questions" and pressured the witness into making statements that incriminated the defendant. (*Ramirez*, at pp. 1112, 1114.) Relying on Evidence Code section 356, the prosecution sought to introduce the witness's entire interview with the police so the jury could determine whether the police acted improperly in obtaining the witness's statements. (*Ramirez*, at p. 1114.) The trial court admitted the recording, finding it to be relevant and not unduly prejudicial. (*Ibid.*) It also admonished the jury that the evidence was not being admitted for the truth of what the officers were saying but for the limited purpose of explaining the witness's answers to their questions and his state of mind. (*Ibid.*) The California Supreme Court concluded that the trial court "did not abuse its discretion in concluding that defense counsel opened the door" on the issue of the witness's state of mind and that the court properly allowed "the prosecutor to rebut [the witness's] testimony by introducing the whole interview to reveal the officers' tone and manner of questioning." (*Id.* at p. 1115; see also *People v. Clark* (2016) 63 Cal.4th 522, 599, 600 [upholding admission of interview tapes where the defense created an impression that an inspector had " 'spoon-fed' " details of the crime to a prosecution witness during their interviews].)

Here, Reed was the one who raised the topic of determinations the State Bar had made regarding the issue of ownership over and entitlement to the settlement funds. As the record reflects, before the trial court admitted the arbitration award, Reed testified the dispute with plaintiffs over ownership of the funds *"had been resolved"* by the State Bar," "[s]*o all of the*

29

*impediments to [his] moving the money were gone.*" (Italics added.) Reed also testified at this point that this resolution had "answered the question of entitlement." At another point, Reed testified he spent all of the settlement funds only "[a]fter it was determined that there was no legitimate dispute, *after the State Bar made that decision.*" (Italics added.) On this record, the trial court properly granted the prosecutor's request to admit evidence of the arbitration award for purposes of rebutting Reed's insinuation that the State Bar resolved the ownership dispute in his favor. That is, admission of the evidence provided another data point from which the jury could determine whether Reed's belief that he owned the settlement funds was in good faith.

Reed counters he did not open the door to the award's admission because he had not intimated that he won the arbitration or that the State Bar told him he was free to take the money. He also points to his later testimony that the State Bar proceeding to which he was referring was the separate complaint filed by plaintiffs relative to the Settlement Authorization Dispute. We find this contention unpersuasive.

The trial court admitted the fee arbitration award because the clear import of Reed's testimony was that the State Bar had sanctioned his taking of plaintiffs' settlement funds. This is evident from Reed's testimony that the State Bar's resolution of the parties' dispute in January 2016 resulted in the removal of "all of the impediments to moving the money" from the client trust account to his personal account because the State Bar had "answered the question of entitlement." Likewise, Reed referenced the "consensus" of six unidentified "different entities" that had purportedly said the "dispute [was] resolved" and Reed could move "the money as [he] [was] required to do under the State Bar rules." It is unclear how this testimony could be understood as anything other than an assertion that the State Bar ruled in Reed's favor on

30

the issue of ownership of the funds. And this remained the case even though Reed later claimed he was actually referring to the separate Settlement Authorization Dispute that plaintiffs initiated against him before the State Bar (in which the State Bar decided not to file charges against him).

Reed attacks the arbitration award on various other bases, including that the award was a "legal nullity" because he requested a de novo trial after the arbitration proceeding and because it was irrelevant. These contentions lack merit.

At the outset, whether the arbitration award was binding or of no legal effect has no bearing on its relevance in this particular criminal proceeding. " 'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." ' " (*People v. Hardy* (2018) 5 Cal.5th 56, 87.) " 'While there is no universal test of relevancy, the general rule in criminal cases might be stated as whether or not the evidence tends logically, naturally, and by reasonable inference to establish any fact material for the prosecution or to overcome any material matter sought to be proved by the defense. [Citation.] Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury.' " (*People v. Freeman* (1994) 8 Cal.4th 450, 491.)

Here, the State Bar fee arbitration award carried probative value on the issue whether Reed maintained a good faith belief in his ownership of the settlement funds. In the absence of the award's admission into evidence, the jury would have been presented with only Reed's self-serving testimony that the State Bar had decided he rightfully owned the funds, which would bolster his good faith defense. The arbitration award was therefore relevant on this material point.

31

Finally, Reed asserts that even if the arbitration award was relevant, its admission was unduly prejudicial under Evidence Code section 352. Reed points out that the award, on its face, addressed the core issue of ownership over the disputed funds which was an essential element of the embezzlement charge. Reed then asserts that the probative value of the award was minimal because it was poorly reasoned and that its administrative findings may have been given more weight than they deserved. As such, Reed contends, the trial court's admission of the award presented an "enormous risk" that the jury would view the award as conclusive evidence of Reed's guilt. We disagree.

Evidence Code section 352 provides in relevant part that a trial court may exclude evidence if its "probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." For purposes of this statute, undue prejudice does not mean merely that evidence is harmful to a defendant's case. (*Kerley*, *supra*, 23 Cal.App.5th at p. 532.) Instead, the term "prejudice" refers to " ' " 'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*.' " ' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 167.)

This standard for prejudice has not been met. As the record demonstrates, the questioning around the State Bar fee arbitration award was straightforward and did not take substantial time to present. Moreover, the jury was twice instructed that the award was non-binding and was being admitted solely for the purpose of assessing the merits of Reed's good faith defense. On balance, and given the court's instructions, the award's probative value regarding the genuineness of Reed's good faith belief in his

ownership of the settlement funds was not outweighed by any threat that the evidence would tend to evoke an emotional bias against him.

###     C.     Trial Court Comments and Cumulative Error

Reed contends the trial court engaged in improper judicial comment at multiple points during the trial.  Specifically, he challenges 15 comments or actions taken by the court which fall into the following general categories: interjections during or after witness testimony to clarify or repeat certain responses or to synthesize certain issues; commentary during a ruling on defense counsel's objections; a statement regarding the court's refusal to certify a defense witness as an expert; and cutting off some of Reed's responses to certain questions.

Familiar principles of law govern our review of these contentions.  A trial court has "broad latitude in fair commentary, so long as it does not effectively control the verdict."  (*People v. Rodriguez* (1986) 42 Cal.3d 730, 768 (*Rodriguez*).)  A court may not, of course, "express its views on the ultimate issue of guilt or innocence or otherwise 'usurp the jury's exclusive function as the arbiter of questions of fact and the credibility of witnesses.' " (*People v. Melton* (1988) 44 Cal.3d 713, 735 (*Melton*).)  But it is well settled that a court "need not confine itself to neutral, bland, and colorless summaries, but may focus critically on particular evidence, expressing views about its persuasiveness." (*Rodriguez*, at p. 768.)  "The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made." (*Melton*, at p. 735.)  In evaluating any claims of judicial misconduct in this area, we determine whether it was reasonably probable the jury would have reached a different verdict had the court refrained from asking these questions or making these comments. (*People v. Harris* (2005) 37 Cal.4th 310, 350–351, citing *People v.*

*Watson* (1956) 46 Cal.2d 818, 836.)  Finally, and importantly here, "[a]s a general rule, a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review."  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320 (*Seumanu*).)

### *Interjections During or After Witness Testimony*

Reed first challenges the trial court's interjection during the portion of plaintiff Turner's testimony that dealt with her acceptance of PG&E's 998 offer.  Reed asserts Turner "struggled mightily" to avoid conceding that she authorized Reed to accept the 998 offer but the trial court reframed Turner's equivocal responses as possibly stemming from her not understanding if defense counsel was asking if she accepted the earlier settlement conference offer that included a separate $75,000 in attorney fees for Reed or the 998 offer that provided her a lump sum of $200,000.

In making this argument, Reed does not identify or meaningfully discuss what specific statement by the court he challenges.  (See *Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 [deeming undeveloped arguments waived].)  Nor, apparently, did his counsel object to anything the trial court said during this line of questioning.  (*Seumanu*, supra, 61 Cal.4th at p. 1320.)  For both of these reasons, we deem Reed's challenge on this matter forfeited.

Next, Reed takes issue with a comment the trial court made after PG&E's counsel testified there generally was no obligation for a defendant (such as itself) to pay attorney fees unless there was a court ruling requiring such payment or some agreement between the parties that a defendant would pay.  Specifically, after PG&E's counsel concluded his testimony on this issue, the court observed that the "People here may be skipping over some stuff that might not be quite clear to the jury."  The court then went on to clarify that if

34

a plaintiff won an inverse condemnation lawsuit, he or she would receive a certain amount for damages and a certain amount for attorney fees. If, however, the matter settled, "[t]here [w]ere at least two different ways to handle that." One way was represented in the earlier mediation proposal that was not accepted where each family would receive $200,000 and Reed would receive $75,000. The other way was "represented in the 998 offer" whereby each family received $200,000 and plaintiffs would then "[have to] deal with whether or not [they] [we]re going to pay any attorney's fees." The court then proceeded to ask both counsel if it said anything incorrect in this synthesis of the issue of how attorney fees could be handled in the event of settlement, and counsel for both parties indicated they had no issue with the court's framing of this issue.

Reed contends on appeal that the trial court's summary of this issue gave jurors the "false impression" it would have been appropriate for plaintiffs to not pay Reed anything for his work on their case. Reed, however, forfeited this challenge. Not only did his counsel fail to lodge an objection (see *Seumanu*, *supra*, 61 Cal.4th at p. 1320), but he affirmatively indicated he had no issue with the court's comments. Regardless, even if we were to reach the merits, Reed fails to identify anything false or misleading in the court's clarification on the topic.

Reed argues the trial court inappropriately intervened when Meadows (the defense witness who testified about attorney billing) was asked about whether the hours Reed put into the case were reasonable. More particularly, Reed notes that after Meadows stated his belief that Reed's "overall billing was perfectly reasonable," the court commented: "I'm not sure I understand that question. I thought you were asking him about the hours, whether they were reasonable. And he said given the hours, the billing was

35

reasonable. It sounds circular." Defense counsel then asked Meadows a second time if he thought Reed billed a reasonable number of hours and Meadows opined the hours spent were reasonable. Reed asserts the court's intervention in this regard made Meadows seem "cagey."

We see no basis for relief. Reed forfeited this challenge by not objecting to the trial court's comment. (*Seumanu*, *supra*, 61 Cal.4th at p. 1320.) Further, Reed's assertion lacks merit because it is reasonably clear that the court was merely seeking to clear up possible jury confusion—a judicial function that is well established. (See *People v. Linwood* (2003) 105 Cal.App.4th 59, 74 (*Linwood*).)

At the end of his testimony, Meadows indicated that if a 998 offer did not indicate a separate amount for attorney fees, a client would only be contractually obligated to pay attorney fees to their lawyer if the representation agreement required it. The trial court then asked the following question: "So in other words, it is fair to say they're not obligated by the 998, but they may be obligated by their agreement with their attorney?" Meadows confirmed this was the case. Though Reed does not challenge the correctness of the court's comment, he contends the comment was unnecessary because there was "no need to have the witness say the same thing twice," particularly when what was being said was not helpful to the defense.

This challenge is both forfeited due to Reed's failure to raise it below (see *Seumanu*, *supra*, 61 Cal.4th at p. 1320) and meritless. A trial court is not barred from "focus[ing] critically on particular evidence." (*See Rodriguez*, *supra*, 42 Cal.3d at p. 768.) Here, the issue of whether the terms of a representation agreement govern the division of a settlement that does not separately address the issue of attorney fees is material because the answer

36

to that question provides the jury with guidance as to what to look for in determining who owns the settlement funds and what distributions should be made. As such, it was entirely appropriate for the court to highlight the portion of the witness testimony that spoke to this issue.

Reed next challenges a question posed by the trial court during the testimony of Jiménez (the State Bar supervising attorney). Specifically, the court asked Jiménez to confirm that an attorney could only remove funds from a client trust fund when it had been determined by agreement or a court ruling how much belonged to the attorney. Since Reed had removed funds without either, Reed asserts the court's question suggested he was guilty of conversion. Additionally, Reed asserts the court erred in having Jiménez confirm that one of Reed's banks was not a bank that had been approved by the State Bar for client trust accounts. Lastly, Reed contends the court improperly commented that a 2006 State Bar opinion relied on by Reed did not relate to the facts of this case.

These challenges are all forfeited because no objection was made in the proceedings below. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1320.) And as recounted earlier in this opinion, the trial court repeatedly clarified to the jury that violating State Bar rules is not itself a crime.

### *Comment to Defense Counsel Regarding His Objections*

Reed challenges a comment made by the trial court when PG&E's counsel was testifying about a heated exchange that occurred between him and Reed after Reed rejected the offer made at the judicial settlement conference which included $75,000 in attorney fees on top of the $200,000 settlement for each family. PG&E's counsel testified that Reed used the " 'F' word" when speaking during this exchange. Defense counsel objected several times to this portion of the witness's testimony on the ground of relevance

37

and the court overruled this objection a few times before saying: "Mr. Cardoza, if you keep making the same objection, you are going to keep getting the same ruling." Reed claims this judicial comment was "uncalled-for" and "harmful" because it "diminished" defense counsel "in the eyes of the jurors" and suggested there was some impropriety in his making these objections.

We acknowledge a trial court should "refrain from making comments before the jury that might suggest it has allied itself with the prosecution." (*Seumanu*, *supra*, 61 Cal.4th at p. 1320.) For example, "[a] trial court commits misconduct if it 'persists in making discourteous and disparaging remarks to a defendant's counsel . . . and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge, and in other ways discredits the cause of the defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1107.) Here, however, this one isolated comment to defense counsel regarding the lack of utility in repeatedly making the same objection does not amount to a persistent pattern of making discourteous and disparaging remarks to defense counsel. No impropriety appears.

### Comment Regarding Court's Refusal to Certify a Defense Witness

Reed points out that when his counsel brought in Meadows to testify regarding the reasonableness of Reed's billing and asked if the trial court would "accept him," the court responded it was "not going to certify or decertify [Reed's] expert for him, but [defense counsel] [could] proceed to ask questions that [he] would ask of an expert." Reed asserts the court's statement made it appear to the jurors that there was some issue as to Meadows' competency to testify. Once again, Reed forfeited this challenge by failing to object below. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1320.) In any event, this passing comment by the court in the context of the examination of

38

a witness whose testimony was relatively short (12 transcript pages) and of relative insignificance could hardly be deemed to be unfair or prejudicial.

### *Interruptions During Reed's Testimony*

Reed identifies several instances where the trial court interrupted or purported to correct his testimony. Reed first highlights that when he testified the bankruptcy of two other clients not involved in this lawsuit had resulted in a delay in plaintiffs' lawsuit, the court expressed its impression that the stay would only affect those other clients' lawsuit. Reed also complains that the court: (1) questioned his testimony that the other clients settled their lawsuit and then objected to that settlement; (2) interrupted his attempt to answer the court's request that he clarify his views on the $204,000 he received for work on plaintiffs' case through settlement of the PG&E Fee Lawsuit; (3) interrupted him when he was recounting the discussions he had with plaintiffs regarding the strength of their case; (4) challenged his assertion that Section 1021.9 granted him priority over client settlement funds; and (5) told him he was "rambling" when he explained another legal theory supporting his belief that he was entitled to plaintiffs' settlement funds. Reed argues that each of these interjections served to damage his credibility in the eyes of the jury.

Reed forfeited these challenges by failing to object to the trial court's comments in the proceedings below. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1320.) His challenges also appear meritless as our review of the record indicates the court's comments largely served the purpose of providing clarification to the jury or controlling the proceedings. (See *Linwood*, *supra*, 105 Cal.App.5th at p. 74 [clearing up jury confusion is a judicial function]; *People v. Sturm* (2006) 37 Cal.4th 1218, 1237 [trial court has a "statutory

duty to control trial proceedings" with a view to the " 'expeditious and effective ascertainment of the truth regarding the matters involved' "].)

Further, with respect to the skepticism the trial court expressed regarding Reed's belief that Section 1021.9 granted him priority of ownership over plaintiffs' settlement funds, we observe the court later stated to the jury that it may have given the jury the impression that it was "somehow lecturing Mr. Reed on how he was wrong on the law," but that it was not the court's intent to do so. The court further stated that if there was other law that supported Reed's theories or Reed reasonably believed other law supported those theories, "then he does, okay." We have no reason to doubt that these comments adequately minimized any conceivable negative effect of the perceived skepticism.

### *Cumulative Prejudice*

Reed asserts the cumulative impact of the errors that occurred in the trial court proceeding was sufficiently prejudicial to warrant a reversal of the judgment.

"Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) Here, however, apart from our assumption of instructional error based on the trial court's mid-trial comments focusing the jury on the issue of Reed's good faith defense (which we conclude did not result in prejudice), there are no errors to aggregate. As such, we reject Reed's claim of cumulative error.

### DISPOSITION

The judgment is affirmed.

40

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P. J.


_____
Rodríguez, J.


*People v. Reed*  (A170827)

41